## Case No. 756.

BAINS v. The JAMES AND CATHERINE.

[Baldw. 544.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1832. [2]

ADMIRALTY JURISDICTION — SEAMEN'S WAGES — SET-OFF—PRESENTING ACCOUNT.

1. An account for provisions furnished to the owner or commander of a vessel, or for articles

---

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

[2] [Affirming an unreported decree of the district court.]

for her use when not on a voyage or in a foreign port, is not within the admiralty jurisdiction of the district court, either as a substantive distinct claim or as an off-set to a libel for seamen's wages. [The General Smith, 4 Wheat. (17 U. S.) 443, distinguished.]

[See Peyroux v. Howard, 7 Pet. (32 U. S.) 324; The St. Lawrence, 1 Black, (66 U. S.) 522; The Lottawanna, 20 Wall. (87 U. S.) 201.]

2. Admiralty jurisdiction is referred to in the constitution as it was restrained by the statutes and common law in England before the revolution, and as it was exercised by the state courts before the adoption of the constitution.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Marsh v. The Minnie, Id. 9,-117; U. S. v. Block, Id. 14,609; and in the dissenting opinion of Mr. Justice Woodbury, in Waring v. Clarke, 5 How. (46 U. S.) 473. Contra, see Waring v. Clarke, 5 How. (46 U. S.) 441; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 344.]

3. The rules which regulated it and the cases where it can be exercised, considered libels for seamen's wages, as held in England not to be within the statutes which restrain the jurisdiction of the admiralty, either as being excepted cases or as coming within the rule of communis error facit jus.

4. Contracts of seamen for maritime service are in effect maritime contracts, governed by the maritime law, which prescribes the rights and obligations of the parties differently from the common law.

[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 421.]

5. In the United States they are regulated by the act of 1790, [1 Stat. 133,] which gives seamen a right to proceed in the admiralty for the recovery of their wages.

6. The seventh amendment to the constitution excludes the jurisdiction of admiralty over contracts regulated by the common law; suits upon such contracts are appropriately "suits at common law" within the terms of the amendment, and are cognizable only in courts of common law.

[Cited in U. S. v. The New Bedford Bridge, Case No. 15,867; Cox v. Murray, Id. 3,304; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 409; Grant v. Poillon, 20 How. (61 U. S.) 169; U. S. v. Shepard, Case No. 16,273; and in a dissenting opinion in Jackson v. The Magnolia, 20 How. (61 U. S.) 322.]

7. No off-set is allowable on a libel for seamen's wages, unless a payment on account thereof.

[Cited in The Two Brothers, 4 Fed. 159.]

8. No account against the vessel is chargeable to the master, unless it is presented in a reasonable time, so that the master may charge it to the owners before settling with them.

[9. Cited in Re Barry, 42 Fed. 121, to the point that the jurisdiction of the federal courts is not derived from the common law. See Ex parte Burrus, 136 U. S. 586, 10 Sup. Ct. 850.]

[10. Cited in U. S. v. The New Bedford Bridge, Case No. 15,867, to the point that the admiralty jurisdiction does not extend to acts "arising within the body of a county." See The Ann Arbor, Case No. 407, and note.]

[11. Cited in Waring v. Clarke, 5 How. (46 U. S.) 488, to the point that the locality of torts must be on "the sea" to confer jurisdiction on the admiralty.]

[Appeal from the district court of the United States for the eastern district of Pennsylvania. Affirmed.]

The case was a libel in the admiralty [by Bains against the schooner James and Catherine] for seamen's wages, to which the claimant offered to set off an account against the libellant, composed in part of provisions furnished him for the use of vessels which he had commanded, and a pump for one of them.

Mr. Hubbell opposed the allowance of the credit, 1. Because the account offered was not cognizable in the admiralty, it being merely for goods and provisions sold, and not on a contract in its nature maritime, or made at sea. Le Caux v. Eden, 2 Doug. 594; 3 Bl. Comm. 106; 3 Mason, 161, [Willard v. Dorr, Case No. 17,680;] [The General Smith,] 4 Wheat. [17 U. S.] 438. The claimant can make no offset against a claim for seamen's wages, otherwise than by showing advances made on account, or some matter which would tend to affect or diminish the amount of compensation due. 3 Mason, 171, [Willard v. Dorr, Case No. 17,680.]

Mr. J. M. Scott, for the claimant.

The libellant might sue at common law, and by changing the forum cannot put the other party in a worse situation than he would be at law. But though he sues in the admiralty, it is a court of equity, and will not permit a recovery against equity and good conscience, though the case may not come within any statute of set-off. 2 Burrows, 826; 2 Gall. 526, 551, [The Brutus, Case No. 2,060.] A court of law will set off one judgment against another. 4 Durn & E. [Term R.] 123. An obligor may set off against the assignee a debt due him by the obligee. 1 Rawle, 227, 291. And courts of admiralty have the same power of allowing set-off, as the courts of Pennsylvania. The debt claimed to be set-off is of admiralty jurisdiction, it being founded on a maritime contract for provisioning and repairing vessels. 2 Gall. 475, [De Lovio v. Boit, Case No. 3,776;] 4 Wash. 454, [Zane v. President, Case No. 18,201;] [The General Smith,] 4 Wheat. [17 U. S.] 438; [The Aurora,] 1 Wheat. [14 U. S.] 96; 2 Gall. 345, [The Jerusalem, Case No. 7,294;] 1 Pet. Adm. 226, 233, [Gardner v. The New Jersey, Case No. 5,233.] And though the contract was made on land, it is incident to matters arising at sea. 2 Pet. Adm. 309, [Moxon v. The Fanny, Case No. 9,895.]

Before BALDWIN, Circuit Justice, and HOPKINSON, District Judge.

BALDWIN, Circuit Justice. The object of the libel was to obtain the payment of the balance of wages due the libellant as mate of the schooner James and Catherine, by shipping articles on a voyage from Philadelphia to Kingston and back. The contract and its faithful performance by the libellant is admitted by the answer, and the difference between the amount claimed, and

that admitted to be earned, is but trifling. The controversy arises on an account set up by the respondent in bar of the claim for wages, by way of set-off, or payment, to which the libellant has demurred; because the contract on which the account is founded, was made and to be performed in the county of Philadelphia, and therefore not cognizable in the admiralty, as also because the admiralty cannot entertain pleas of set-off.

As the first ground of demurrer goes to the jurisdiction of the court, it must be first considered. The first item of the account of the respondent is a balance of account of 31 dollars, due in 1822, the items composing it not being stated, but averred generally in the answer to have been for provisions furnished by the respondent for different vessels, owned or commanded by the libellant, and a pump for the sloop Polly, so owned and commanded. The judicial power of the United States extends to all the cases enumerated in the third article of the constitution, but to none other; as this account is between two citizens of Pennsylvania, it is not cognizable by the courts of the United States; unless it presents a case arising under the constitution, laws or treaties of the union, or is a subject of equity, of admiralty or maritime jurisdiction. The first is not pretended, and it is therefore incumbent on the respondent to bring his case within the other provisions of the constitution. To do this it is necessary to show that at the time of its adoption, cases of this description were cognizable in the admiralty in any shape, whether by original libel, counter claim, or set-off, arising from either the nature of the contracts, its subject matter, or application; for as a mere balance of account, there can be no pretence that it is any other than a contract at common law, cognizable only in courts of law.

There is nothing in the nature or subject matter of the account which can vary its character, it is to be performed on land within the jurisdiction of this state; it is subject to none of the casualties, conditions, terms, or peculiar obligation of marine contracts. The credit is not given or accepted on any express or implied pledge of ship, cargo or freight, or on the faith of either. The answer contains no such allegation. Neither does it specify the kind of provisions furnished, their quantity or use, whether in port or on a voyage; or whether they were purchased by libellant as owner or commander of the respective vessels, or set forth any circumstances which vary it from a case of mere personal credit. Taking the account then as it is stated, and the application of the items to have been as alleged, it presents no one feature of a marine contract, or any maritime attribute or quality to which any part of admiralty or maritime law can apply. It is, in the words of the constitution, "a case in law," not a controversy "between citizens of different states," but of the same state, cognizable only in the federal courts, by the principles of the common law, if the plaintiff was competent to sue therein.

The counsel for the respondent has ably and ingeniously endeavoured to establish the position, that the admiralty has jurisdiction in personam over all contracts for materials and provisions furnished, and labour performed in building, repairing, equipping and provisioning ships; in doing which he has entered into a very extensive range of investigation of the jurisdiction of courts of admiralty, a subject on which great contrariety of opinion has existed and yet exists among the most learned judges and jurists of this country. It was once a very vexed question in England, between the courts of Westminster Hall, which were governed by the common law, and the admiralty courts, which acted under the orders of the king in council, and proceeded according to the principles of the civil law; but after a long struggle the latter yielded, and their proceedings have for more than two hundred years, been constantly controlled and held in restraint by the courts and rules of the common law. The decisions on this subject have often been reviewed and commented on in our courts, but without any satisfactory results, and there has been no decision of the supreme court settling the question.

There is a dictum in the case of The General Smith, 4 Wheat. [17 U. S.] 443, stating the opinion of the court, in affirmance of the admission of counsel of the claimant, previously made in argument, that the admiralty had a general jurisdiction in cases of material men, both in personam and rem; but this point formed no part of the judgment of the court, was not before them, and could not be settled by this declaration of an abstract opinion in a case, where a ship was libelled on a claim which was adjudged by the court to be no lien in the case before them. [Satterlee v. Matthewson,] 2 Pet. [27 U. S.] 413. The court did not take the point to be settled eight years afterwards, when it came up in the case of Ramsay v. Allegre; they did not consider the general question of jurisdiction, but decided the case on other grounds. 12 Wheat. [25 U. S.] 611. Mr. Justice Johnson, who was one of the court when the opinion in the case of The General Smith was delivered, considers the remarks on this subject as mere dicta, and dissents from them in a very able, learned opinion, in which he utterly denies the jurisdiction of the admiralty in personam, in the cases referred to. Not being then bound to take the law as settled by the opinion of the judges as declared in 4 Wheat. [17 U. S. 438] and finding that the decisions of the different circuit courts are in direct contradiction on the subject of this branch of admiralty jurisdiction, I am at liberty to consider it, as not so firmly established as to make it improper for me to

be guided by my own judgment of the law as it was settled before the adoption of the constitution. The jurisdiction of the courts of admiralty in England, is a part of the royal prerogative conferred on the lord high admiral by the king's commission, (4 Co. Inst. 124,) and exercised by his deputies and inferior officers forming courts of different grades, from the highest of which an appeal lies to the king in council; but not being courts of record, their proceedings cannot be reviewed according to the course of the common law, and no act of parliament has provided for an appeal to the house of lords, as from the high court of chancery. Vide 3 Bl. Comm. 69.

The jurisdiction of the admiralty was deemed a jewel of great lustre and value in the diadem or crown of the king, and was carried to great extent by the lord high admiral and his officers; but however it might be cherished and enlarged by them, in order to extend the king's and their power, and promote their interest, it was odious to the commons of England, who became alarmed at the encroachments upon the jurisdiction of the courts of common law, and called loudly for the redress of the grievance. Similar complaints were made against the encroachments of the court of chivalry, which was composed of the lord constable and earl marshal, which had conusance of deeds of arms, and of things touching arms, which could not be determined by the common law, and remedies were provided for both cases. The statute 13 Rich. II. c. 2, (1 Ruffh. St. 385; Keb. 173,) prohibited the court of chivalry from entertaining any plea "that might be tried by the law of the land," and provided a remedy by a writ compelling them to surcease proceedings. Chapter 5 prohibited the admiral and his deputies from meddling with any thing done in the realm, and on the sea only as it had been used in the time of Edw. III. (1 Ruffh. St. 385;) this statute proving insufficient, another was passed, on the grievous complaint of all the commons, in 15 Rich. II. c. 3, (1 Ruffh. St. 400; Keb. 180,) the prohibition of the admiral's jurisdiction was more explicit and extensive, excluding it from all things done in the body of a county, as well by land as by water, or wreck of the sea. The parliament, finding that laws merely prohibitory, did not prevent the encroachments of the admiralty, again interfered in 2 Hen. IV. c. 11, on the prayer of all the commons, and passed an act authorizing the party aggrieved by any usurpation and exercise of admiralty jurisdiction, to sue the plaintiff, and directed that he should recover double damages, declaring that the statute and common law should be holden against the admiral and his deputies. 1 Ruffh. St. 438; Keb. 193. As this statute empowered the courts of common law to vindicate its principles, and secure the right of trial by jury by amercing plaintiff in the courts of admiralty in heavy and double damages; and

as the court of king's bench, in the exercise of its high prerogative and supervisory powers over all inferior courts and tribunals, issued writs of prohibition which neither the admiral or his deputies dared to disobey, they were compelled to submit to the statute and common law of the kingdom, in civil and criminal cases. But they yielded with a bad grace. In the 8 Jac. I., more than two hundred years after the statute of 2 Hen. IV., the lord high admiral made a formal complaint on the subject to the king, against the judges, concerning prohibitions granted to the court of admiralty.

The fifth grievance complained of by the admiral is worthy of special attention. "That the clause of non obstante statuto, which bath foundation in his majesty's prerogative, &c., is current in other grants; yet in the lord admiral's patent, is said to be of no force to warrant the determination of the causes committed to him in his lordship's patent, and is rejected by the judges of the common law."

Such was the audacity of the pretensions of the admiralty, that it claimed to exercise jurisdiction in virtue of the king's patent, in defiance of the acts of parliament; and the complaint against the judges was, that they enforced the supreme law of the kingdom. On a reference of the complaint by the king to the judges, they met it by acts of parliament, judicial proceedings, and adjudged cases, which exposed and put an end to the audacious claims asserted by the admiralty, 4 Co. Inst. 134, 142. This occurred in the reign of Jac. I., from which time the statutes in restraint of admiralty jurisdiction have been observed and enforced by the courts of common law, so as to prevent any encroachment by prerogative courts, in contravention of the established laws. It is not necessary for me to examine in detail the adjudged cases in the English courts. It would be useless, after the able review of them by Judge Johnson in Ramsay v. Allegre, 12 Wheat. [25 U. S.] 614, &c., as to the claims of material men to proceed in personam in the admiralty, and by a very distinguished jurist and statesman who presided in the state court of admiralty in this state, during and after the revolution, as to the same claim to proceed in rem. The conclusion to which both arrived was, that such claim was inconsistent with the law as it existed in England before, and in the United States after the separation. It is also needless to combat the proposition, that the civil jurisdiction of the admiralty was more expanded in the colonies than in the mother country; or that it could be exercised in opposition to the established course of the law of England, without an act of parliament to authorize it. As appeals lay from the colonial courts of admiralty, the line of their jurisdiction was necessarily that which was the rule for the appellate court. The courts of both the colonies and mother country, were organized on similar principles; each with its

appropriate jurisdiction, as prescribed by statutes or regulated by usage, the evidence of which is in the adjudications of the courts in England, and those of the colonies and the states, which acted on the rules established by early statutes, and their uniform construction down to the revolution. The civil jurisdiction of courts of admiralty was confined to matters arising on the sea, out of the body of any county, and to subject matters in their nature maritime, or done in the prosecution of a voyage. Courts looked to the nature of the act done, as well as its locality, and though the act was done on shore, as the pawning a ship for the emergencies of a voyage, yet being of a maritime nature, and the cause rising on the sea, it was cognizable in the admiralty. 6 C. Rob. Adm. 40; Bee, 420, 435, [Clinton v. The Hannah, Case No. 2,898; and Shrewsbury v. The Two Friends, Id. 12,819;] Hob. 11; 1 Salk. 35. If a vessel is taken as prize, the legality of the capture must be tried in the admiralty, (1 C. Rob. Adm. 238; Bee, 371, [Dean v. Angus, Case No. 3,702;] Doug. 591, 597;) so of a cause of action growing out of a capture as prize, (Bee, 372, [Dean v. Angus, supra,]) or if goods are taken piratically at sea, they may be followed in the admiralty on land, because the original cause arose at sea, (3 Bulst. 29; Cro. Eliz. 685.) But if a mere trespass is committed at sea, or the original cause arises on land, or on the sea, in the body of a county, or is not of a maritime nature, though arising on the sea, the cognizance thereof belongs to courts of common law, who will prohibit the admiralty from proceeding therein. Bee, 435, [Shrewsbury v. The Two Friends, Case No. 12,819;] 4 Co. Inst. 134; Hob. 212; 2 L. R. 805.

Such is the admitted course of proceeding by the statute and common law of England. But it is alleged, that the jurisdiction of courts of admiralty in the United States is more extensive, and that the constitution has re-established it, as it was claimed by the admiralty before the restraining statutes of Rich. II. and Hen. IV., and that it may now be exercised in all cases, where it is authorized by the civil law, or had been exercised under the king's commission to the admiral. Should this construction be given to the constitution, it will present, in striking contrast, the opinion of the people of the states who adopted it, and the opinion of the people of England, during the four hundred preceding years, on the right of trial by jury, and the preference of the common to the civil law. It will also present in as striking a view, the great difference between the opinions of those who composed the first congress of the revolution, and the members of the convention, who framed the constitution, in relation to admiralty jurisdiction, in all its branches.

In the preamble to the declaration of the rights of the colonies in October, 1774, one of the grievances complained of was, that parliament had, by late acts, "extended the jurisdiction of courts of admiralty not only for collecting the said duties, but for the trial of causes merely arising within the body of a county." In the fifth resolution it is declared, "that the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." It was also "resolved, that the following acts of parliament are infringements and violations of the rights of the colonists, and that the repeal of them is essentially necessary in order to restore harmony between Great Britain and the American colonies, viz.: the several acts of (naming them) which impose duties for the purpose of raising a revenue in America, extend the power of the admiralty courts beyond their ancient limits, deprive the American subject of trial by jury, &c., are subversive of American rights." Vide Journals of Congress 27, 29, 14th of October, 1774. Among the grievances enumerated in the declaration of independence, is the following: "for depriving us in many cases of the benefit of trial by jury." These declarations show that the same spirit which actuated their ancestors in England, descended to the colonists with equal zeal, in favour of the common law, the right of trial by jury, the restriction of admiralty jurisdiction to its ancient limits, and against its exercise "over causes merely arising within the body of a county." It is not credible that principles, thus consecrated, would be abandoned by the people of the colonies, when they made themselves states, by their declaration of independence, or that they solemnly reversed them when they adopted the constitution. No state ever passed any law in accordance with the acts of parliament which led to the revolution, which in any way abridged the right of trial by jury, even in civil cases, or abrogated any principles of the common law, by substituting in their place the rules of the civil law, which had not been adopted in the mother country. Nor is there any pretence that the admiralty courts, in any of the states, between the declaration of independence and the adoption of the constitution, had ever assumed the jurisdiction of civil causes not cognizable by the courts of admiralty in England. On the contrary, all such courts whose decisions are known, have asserted and acted on the principle that their admiralty jurisdiction was confined to the cases, and must be exercised by the rules which had defined it in England. The able and learned opinions of Judge Francis Hopkinson, in the admiralty court of Pennsylvania, in Dean v. Angus, in 1785, [supra,] and in Clinton v. The Hannah, in 1781, [Case No. 2,898,] are full and conclusive on the subject. His character as a jurist and statesman is well known to all of us. We cannot presume him to have been ignorant of the law of courts of admiralty, or withhold from his opinions the high respect

to which they are justly entitled. Another distinguished civilian, Judge Bee, of South Carolina, also examined the subject most ably in Shrewsbury v. The Two Friends, in 1786, [Id. 12,819,] and laid down the law in the same way. Judge Peters uniformly adopted the principles on which Judge Hopkinson acted. 1 Pet. Adm. preface, V., [Append. Fed. Cas.] He held that the people of the states had adopted the common law, and the maritime law as a part of it, existing at the revolution,—1 Pet. Adm. 112, [Thompson v. The Catharina, Case No. 13.949,]—and laid down the broad proposition that "the maritime laws of England existing before our revolution, and consistent with our situation are yet our laws. It is but recently that admiralty cases have been published. We have therefore unavoidably recourse to their common law books for authority." 1 Pet. Adm. 229, [Gardner v. The New Jersey, Case No. 5,233.]

Few men were more familiar with the jurisprudence of the states, or the political history of the country, than Judge Peters, from before the revolution till the adoption of the constitution; the high authority of his opinions, concurring with Judges Hopkinson and Bee, is the highest judicial evidence which we can have, of the nature and extent of admiralty jurisdiction as it existed, when the states granted it by the constitution to the courts of the United States. It was a jurisdiction limited and defined by the statute and common law, its boundaries had been declared by adjudications in the courts of the states, so recently before the framing of the constitution in convention, that they must have been familiar to the members. To the states in which courts of admiralty had been long held, its jurisdiction was well known, and in the absence of any judicial authority under the governments of the states, in opposition to what has been referred to, we must consider this jurisdiction to have been granted, precisely as it had been previously exercised. ·

As the obnoxious acts of parliament ceased to have any force after the declaration of independence, the jurisdiction of courts of admiralty which those acts conferred, necessarily ceased with them, and could not be exercised without the authority of a state law. All matters relating to revenue. the regulation of commerce and navigation, were therefore cognizable only in the courts of common law in the several states, as they were in England from time immemorial; for the most strenuous advocates of the admiralty never pretended that it had jurisdiction over these subjects prior to the statutes of Richard II. The criminal jurisdiction of offences committed on the sea, within the body of a county, was made cognizable by a special court organized by the statute 28 Hen. VIII. c. 15, (2 Ruffh. St. 258,) which was directed to proceed according to the course of the common law. 3 Co. Inst. 111. When

the offence was committed on the main sea or the coasts of the sea, being no part of the body of any county, it was declared to be cognizable in the admiralty by the statute 27 Eliz. c. 11. 4 Co. Inst. 137.

From this time the line which separated the jurisdiction of admiralty in all its branches from that of the common law, remained firmly settled, and the jurisdiction of the common law over matters excluded from the admiralty was unquestioned. All causes arising in the body of a county, or arising on the sea, unless of a maritime nature, were cognizable by the courts of common law, and the principles on which they granted prohibitions to courts of admiralty, were as much a part of the common law as the rules of descent. It was a part of that great system of English jurisprudence which the colonists adopted in its largest sense,—1 Gall, 493, [U. S. v. Coolidge, Case No. 14,857,]—as a general and fundamental law, unless altered by acts of assembly, or was not adapted to their condition,—[Morris' Lessee v. Vanderen,] 1 Dall. (1 U. S.) 67; 9 Serg. & R. 330, 358; 11 Serg. & R. 273; [Town of Pawlet v. Clark,] 9 Cranch, [13 U. S.] 333,—which the people of each state claimed as their birthright, from the beginning of the revolution. As this system is the basis of the judicial institutions of all the states, it is incumbent on those who assert that any part of it is not in force, to prove it as an exception. 9 Serg. & R. 334. Especially is it incumbent on those who assert that the people of the American colonies or states were more in favour of the extension of admiralty jurisdiction beyond its ancient limits, so as to embrace the trial of causes merely arising within the body of a county, and less attached to the inestimable right of trial by jury than their English ancestors, to establish it by irrefragable proof. The unanimous declaration of rights by the congress of 1774, expressed the then sense of the people of the colonies, and there has never been a jurist or statesman who has controverted the principles of government and policy therein promulgated. On the contrary, these principles have been adopted as the foundation on which the state and federal constitutions have been built.

In the grant of judicial power over cases of admiralty and maritime jurisdiction to the courts of the United States, the right of trial by jury of all crimes (except in cases of impeachment) is carefully secured; "and such trial shall be had in the state where the said crimes shall have been committed; but when not committed within any state the trial shall be at such place or places as congress may by law have directed, article three, section two, clause three, of the constitution of the United States." The sixth amendment is still more explicit. "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the

crime shall have been committed, which district shall have been previously ascertained by law."

These provisions go to the root of the criminal jurisdiction of the admiralty, over offences committed on the high sea; thus far the American people have solemnly affirmed their declaration of rights, and excluded from the admiralty a branch of jurisdiction which the statutes of England authorized them to exercise. It remains to inquire whether they have, by the same instrument, enlarged the civil jurisdiction of the admiralty, so as to extend it to causes arising within the body of a county, which were cognizable exclusively by the courts of common law in England.

In pursuing this inquiry, I am not at liberty to overlook the view of the constitution which has been taken by the supreme court; or if I was, I would not be so presumptuous as to attempt to make a better one than is to be found in their opinion in Parsons v. Bedford, 3 Pet. [28 U. S.] 446, 447: "The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy. The right to such a trial is, it is believed, incorporated into, and secured in every state constitution in the union; and it is found in the constitution of Louisiana. One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the constitution was adopted, this right was secured by the seventh amendment of the constitution proposed by congress; and which received an assent of the people so general, as to establish its importance as a fundamental guarantee of the rights and liberties of the people. This amendment declares, that 'in suits at common law, where the value in controversy shall exceed 20 dollars, the right of trial by jury shall be preserved; and no fact once tried by a jury shall be otherwise re-examinable in any court of the United States, than according to the rules of the common law.' At this time there were no states in the union, the basis of whose jurisprudence was not essentially that of the common law in its widest meaning; and probably no states were contemplated, in which it would not exist. The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence. The constitution had declared, in the third article, "that the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority,' &c. and to all cases of admiralty and maritime jurisdiction. It is well known, that in civil causes, in courts of equity and admiralty, juries do not inter-

vene, and that courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court. When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment. By common law, they meant what the constitution denominated in the third article 'law;' not merely suits, which the common law recognised among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognised, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity was often found in the same suit. Probably there were few, if any, states in the union, in which some new legal remedies differing from the old common law forms were not in use; but in which, however, the trial by jury intervened, and the general regulations in other respects were according to the course of the common law. Proceedings in cases of partition, and of foreign and domestic attachment, might be cited as examples variously-adopted and modified. In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights. And congress seems to have acted with reference to this exposition in the judiciary act of 1789, [1 Stat. 77,] c. 20, [§ 9,] which was contemporaneous with the proposal of this amendment; for in the ninth section it is provided, that 'the trial of issues in fact in the district courts in all causes, except civil causes of admiralty and maritime jurisdiction, shall be by jury;' and in the twelfth section it is provided, that 'the trial of issues in fact in the circuit courts shall in all suits, except those of equity, and of admiralty and maritime jurisdiction, be by jury;' and again, in the thirteenth section, it is provided, that 'the trial of issues in fact in the supreme court in all actions at law against citizens of the United States, shall be by jury.' " This view of the constitution and seventh amendment, is in perfect accordance with the spirit of the revolution, and perpetuates the principles of the congress of 1774, as settled constitutional law.

As the extension of admiralty jurisdiction beyond the line prescribed in England is necessarily a deprivation of the right of trial by jury, and a substitution of the civil for the common law in cases cognizable only by the latter in 1774; any construction which will give to the term admiralty and maritime jurisdiction, a more expanded meaning than the term had in England, must be rejected. In the emphatic language of the supreme court "the want of an express pro-

vision securing the right of trial by jury in civil causes, led to the adoption of the amendment;" it is therefore the bounden duty of every court, to so construe it as to effect that object. "In a just sense the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." In defining "suits at common law," in the amendment, the supreme court declare the term to be, what is denominated "cases in law" in the third article of the constitution; what then are such suits or cases? The court gives the answer, "not merely suits which the common law recognised among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognised, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity, was often found in the same suit." Adhering to this definition, the constitution becòmes intelligible, in its reference to the three classes of cases to which the judicial power extends:

1. Cases in law, or suits at common law, wherein legal rights are to be ascertained, and legal remedies administered according to the old and established proceedings at common law.

2. Cases or suits in equity where equitable rights only are recognised, and equitable remedies administered.

3. Cases or suits in the admiralty, where there is a mixture of public or maritime law and of equity in the same suit.

Whether there is not a fourth class of cases, those of maritime jurisdiction independently of those of admiralty, need not now be examined.

It is next to be inquired by what rule or standard we are to ascertain what is a case in law, equity or admiralty, as contradistinguished from each other? The only rule furnished by congress, is in the acts regulating process in the courts of the United States, which provide, that the forms of writs, executions and other process in suits at common law, shall be the same as used in the supreme courts of the respective states; "in those of equity and admiralty and maritime jurisdiction, according to the principles, rules and usages which belong to courts of equity, and to courts of admiralty respectively, as contradistinguished from courts of common law. 1 Story, 67, 257, [1 Stat. 93, 275. c. 36.] No act of congress has defined this line of contradistinction, no state laws had done it before the adoption of the constitution; the jurisdiction of the respective courts had been well settled, and was well understood previously, so that no new statutory definition was necessary. The existing judicial systems of the states had been founded on the principles of the English jurisprudence. The

application of the principles of the common law was universal as the rule of jurisdiction, unless altered by local statutes or usage. Hence we find that in the judiciary act, congress refer to "the common law," "the principle and usages of law" as terms of definite import, referring to the common law, and as adopted in the states. [Bank of U. S. v. Halstead,] 10 Wheat. [23 U. S.] 56, 58. In the ninth section giving admiralty and maritime jurisdiction to the district court is this expression; "saving to suitors in all cases, the right of a common law remedy in all cases where the common law is competent to give it," "and shall have cognizance of all suits at common law," &c. The eleventh section gives the circuit court jurisdiction of "all suits of a civil nature at common law or in equity," &c. The thirteenth section authorizes the supreme court, "to issue writs of prohibition to the district courts when proceeding as courts of admiralty and maritime jurisdiction, and writs of mandamus in cases warranted by the principles and usages of law," &c. The fourteenth section gives the circuit courts power to issue writs not specially provided for agreeably "to the principles and usages of law." The fifteenth section gives them power to compel the production of papers "in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery." The sixteenth section provides that suits in equity shall not be sustained in any case where complete remedy can be had at law.

The seventeenth section authorizes new trials to be granted "for reasons for which new trials have been usually granted by courts of law. Vide 1 Story, 56, 58, [1 Stat. 83.] Indeed the whole legislation of congress in relation to the judicial system of the United States, shows their reference to a pre-existing system, to which the terms they use are to be applied. Neither the constitution, the amendments, or laws, give a definition of law, equity, admiralty, or trial by jury," but the terms are not consequently indeterminate, or open to any construction which may be put upon them; they must be taken in the sense in which they have been universally understood through all time, by the people, the conventions and governments of the states and union. The jurisprudence of England is the test and standard to which these terms are to be referred, and by which they are clearly defined. In Robinson v. Campbell the supreme court declare, "that to effectuate the purposes of the legislature, the remedies in the courts of the United States are to be at common law or in equity, not according to the practice of state courts, but according to the principles of common law and equity, as distinguished and defined in that country from which we derive our knowledge of these principles." 3 Wheat. [16 U. S.] 222, 223. "And as the courts of the union have a chancery jurisdiction in every state, and the

judiciary act confers the same chancery powers on all, and gives the same rule of decision, its jurisdiction in Massachusetts must be the same as in other states." [U. S. v. Howland,] 4 Wheat. [17 U. S.] 115.

So far then as relates to the respective jurisdiction of courts of law and equity, under the constitution, its amendments and the judiciary act, as construed by the supreme court; the jurisprudence of England is the test and standard of reference. The next question is to what period of time this reference is to be made; on this subject there is little or no difference of opinion. The people of the several states, delegated to the United States a judicial power over cases at law, equity and admiralty, according to the rules and principles established in England before the revolution, according to general opinion; and according to the opinion of some, at the adoption of the constitution and passage of the judiciary act. Certain it is, that all laws which extended to the colonies before the revolution, which were adopted by usage or acts of assembly, were enforced as a part of the jurisprudence of the states, as well as the common law. Statutes also which were "passed before the emigration of our ancestors, being applicable to our situation, and in amendment of the law, constitute a part of our common law." Patterson v. Winn, 5 Pet. [30 U. S.] 241. And the construction of such statutes which prevailed at the revolution is the rule for the courts of the United States. Cathcart v. Robinson, 5 Pet. [30 U. S.] 280, 281. It only remains to inquire, whether the framers of the constitution, its amendment, and the judiciary act, intended to make the English system the standard by which to test the respective jurisdiction of the courts of law and equity, and the civil law the standard of admiralty jurisdiction; or whether it was intended to refer to the English system, as it was settled at the revolution, the adoption of the constitution, or passage of the judiciary act, to ascertain what was a case in law or equity; but to go back four hundred years, and ascertain by the law of England as it was understood before the restraining statutes of Richard II., passed in 1389, (vide 1 Ruffh. St. 385,) what was a case in admiralty at that time. If the advocates of an admiralty jurisdiction, broader than consists with the statutes and common law of England, take the first position, the seventh amendment is necessarily annulled; for if a case arises which is by the English system a suit at common law, the amendment embraces it, and there must be a trial by jury. If a suit on such a case is sustained in the admiralty according to the civil law, there is no trial by jury, and the amendment does not apply; such a result makes the amendment contradict itself. If by the English law, a given case is one confessedly cognizable only by a court of common law, yet by the civil law it is as clearly cognizable in the admiralty; then if the amendment refers to the former for the definition of a suit at law, and the constitution refers to the latter for the definition of a suit in the admiralty, the amendment is a felo de se, as well as directly subversive of the object, which the supreme court declare it was passed to effectuate,—to supply the want of an express provision in the constitution, securing the right of trial by jury in civil cases. The defendant is excluded from a trial by jury in the very case provided for by the amendment. The constitution and amendment must of course be referred to the same system for the definition of the three classes of cases, or the constitution controls the amendment by the grant of a jurisdiction to the admiralty, over a "suit at common law," in which the trial by jury is secured. Such a doctrine would subvert the government, by making the constitution of paramount authority to the power which created, and can amend it in all its provisions, except the equal representation of each state in the senate.

If by assuming the other position the terms law, equity, admiralty are referred for their definition and contradistinction from each other to different periods, it will be attended with difficulties which cannot be surmounted. It must be taken to be the settled construction of the constitution by the supreme court, that the terms "cases in law and equity," refer to the line drawn between the respective courts in England, at some period. Assuming that to have been the 13 Rich. II. (1389), we go back to a time when there was neither a court, nor a system of equity jurisdiction, as contradistinguished from law; those who contend that the system of federal jurisprudence was intended to be organized on the model of that of England at that period, must be left to establish the proposition as they can. To reason upon it seriously, is difficult for those who oppose it. It is as difficult to reason on the proposition, that the framers of the constitution referred to the state of the law at that period, to ascertain what was a case of admiralty jurisdiction, while they referred to a period four hundred years later to ascertain what was a case of common law or equity jurisdiction. The same difficulty attends the discussion of the proposition, that when the common law was adopted in the colonies, the states, the constitution and judiciary act; that part of it should have been excluded, in virtue of which the courts of common law issued prohibitions to the admiralty, and all other prerogative courts. This is certainly not a time to contend, that it is congenial to the spirit of American institutions, to adopt the principles of courts proceeding according to the course of the civil law, under a patent of non obstante statuto, and without a trial by jury, in preference to the rules and principles of the common law. Nor can it be necessary to enter upon an argument to show that the statutes of England, though passed before

the settlement of the colonies, which restore the common law, secure the trial by jury, and confine all courts within the line which the law prescribes for their jurisdiction, are in accordance with all our institutions, suited to the condition of the colonists, and were adopted by them as part of the common law.

It has been shown that the jurisdiction of the admiralty, was asserted in virtue of the king's prerogative to dispense with acts of parliament; the assertion of such a right by James II., was deemed so subversive of a fundamental principle of the English constitution, that it was declared to be an abdication of the crown at the revolution of 1688. 4 Ruffh. St. 440.

Whether the people of the United States intended by their constitution of 1788, to reestablish the supremacy of prerogative over law, or to authorize the district court to exercise a jurisdiction commensurate with that claimed by the admiral in his appeal to James I., as more congenial to the spirit and principles of the revolution of 1776, than the principles of their ancestors, is not deemed worthy of further inquiry. Certain it is, that the fear of such an assumption of jurisdiction, led to the seventh amendment, which was intended to remove all doubt by placing the right of trial by jury in suits at common law, beyond the danger of violation by any power under the constitution, "and which received an assent of the people so general as to establish its importance as a fundamental guarantee of the rights and liberties of the people." [Parsons v. Bedford,] 3 Pet. [28 U. S.] 446. A fundamental guarantee of the rights and liberties of the people, by sanctioning an admiralty jurisdiction according to the civil law, which repudiates the trial by jury, or on the principles asserted by the admiralty in England, in virtue of royal prerogative! If this is the only security left for the right of trial by jury in civil cases, the amendment has been made in vain, for the admiralty is left open to every plaintiff, who can bring his case within the rules of the civil law, or the English admiralty, according to their pretensions, prior to the statutes of Rich. II., in which the defendant cannot have the benefit of this "fundamental guarantee;" wholly abjuring any construction of the amendment, which would make it a fundamental and solemn mockery, I feel bound to give it a practical meaning, consistently with the solemn, repeated and uniform decisions of the supreme court. An amendment to the constitution, annuls all jurisdiction which the constitution grants, whether past, present or future, which is contrary to the amendment; it arrests the action of even the supreme court, in cases depending before them prior to the adoption of the amendment, and operates as an absolute prohibition to the exercise of any other jurisdiction than dismissing the suit. [Hollingsworth v. Virginia,] 3 Dall. [3 U. S.] 378, 382; [Cohens v. Virginia,] 6 Wheat. [19 U. S.] 405, 409; [Osborn v. Bank of U.

S.] 9 Wheat. [22 U. S.] 868. The supreme court has declared the object of the seventh amendment, and inferior courts must so construe and enforce it as to effectuate that object. This fundamental guarantee of the right of trial by jury, applies to all cases or suits which the common law recognises among its old and settled proceedings, in which legal rights are to be ascertained, and legal remedies administered, whatever may be the peculiar form which they may assume. [Parsons v. Bedford,] 3 Pet. [28 U. S.] 447. These are cases or suits at law; let the plaintiff resort to what court he may, it does not change their nature, they cannot be cases in equity or admiralty, as contradistinguished from courts of law; the term a case or suit at law, refers to the cause of action, the remedy, and the mode of enforcing it, not to the forum to which the plaintiff may choose to resort. This is the meaning of the term in the constitution and amendment as judicially settled. It is also the manifest meaning of the judiciary act, which was passed at the same session of congress in which the amendments to the constitution were recommended to the states.

By the ninth section, the district court has "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction;" by the eleventh section, the circuit courts have "original cognizance concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity," &c. From these two sections three propositions necessarily follow; 1. If the suit is one of admiralty jurisdiction, its cognizance is exclusively in the district court, and it cannot be sustained in a circuit or state court; 2. If it is a suit at common law or in equity, it can be sustained in a circuit or state court; and 3. Such cases cannot be sustained in a district court, as a case of admiralty jurisdiction. In thus distributing the judicial power among the inferior courts, and assigning to each the cognizance of particular cases, congress have evidently done it with a reference to some antecedent pre-existing rules, which distinguished the different classes of cases from each other; they have also intended to refer to some system which has defined them by such lines as will prevent a collision between the different courts, on the subject matters of their respective cognizance. Those rules cannot be found in the civil law, which does not distinguish cases at law from cases in equity; and as that code recognises neither suits at common law, courts of common law, or trial by jury, it is so utterly incompatible with the judiciary act, that their repugnance is apparent at first blush. It is therefore a self evident proposition, that the jurisprudence of the United States is not founded in the civil law, and that a reference must be had to some other system to define what is a case at law or in equity; it is equally evident that the definition of a case of admiralty jurisdiction, must

be sought in the same system which defines the other cases, otherwise the courts will be involved in perpetual conflicts of jurisdiction. Conclusive as this view of the ninth and eleventh sections is, from their language and the subject matter to which they refer; the provisions of the thirteenth and fourteenth sections are too positive to leave a doubt as to the system of jurisprudence on which the courts of the United States were organized. The supreme court "shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction, and writs of mandamus in cases warranted by the principles and usages of law, to any courts appointed or persons holding office under the authority of the United States." 1 Story, 59 [1 Stat. 80, § 13.]

The fourteenth section gives to all the courts power to issue "all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." In referring to which term, "agreeable," &c., the supreme court say, it doubtless embraces writs sanctioned by the principles and usages of the common law. [Bank of U. S. v. Halstead,] 10 Wheat. [23 U. S.] 56. It being the settled doctrine of the supreme court, that by the terms "principles and usages of law," congress refer to the common law, the conclusion follows, that the common law is the standard by which to ascertain what are proper cases for a pro̅ bition to a court of admiralty, and not the civil law; still less those principles on which the admiralty courts in the time of Jac. I., protested against the right of the king's bench to grant prohibitions. This section of the judiciary act, is therefore a decided and express repudiation of the past and present pretensions of the admiralty to the cognizance of any cases where prohibition would be granted in England; that it is constitutional cannot be doubted, as the supreme court in the case of the United States v. Richard Peters, district judge, affirmed their authority under this section by issuing a prohibition. [U. S. v. Peters,] 3 Dall. [3 U. S.] 121.

A reference to the act of congress for the regulation of process in the courts of the United States, will show that the rules of the civil law have been carefully excluded. By the process act of 1789, the forms and modes of proceeding in causes of equity and of admiralty and maritime jurisdiction, shall be according to the course of the civil law. 1 Story, 67, [1 Stat. 93.] But by the act of 1792, the form and modes of proceeding in such cases were directed to be, "according to the principles, rules and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law." 1 Story, 258, [1 Stat. 275, c. 36.] We must then resort to that system of jurisprudence, in which there are courts of common law, as contradistinguished from courts of equity and admiralty; to resort to the civil law for the rules which define the respective jurisdiction of these courts, when congress have excluded them as to the forms and modes of proceeding, would be manifestly opposed to the law. Such resort would also be useless, as the civil law recognises no courts of common law. Both of these acts have been deliberately examined by the supreme court, in Wayman v. Southard. They declare that "the forms of writs and executions and modes of proceeding in suits at common law, and the forms and modes of proceeding in causes of equity and admiralty and maritime jurisdiction, embrace the same subject, and both relate to the progress of a suit, from its commencement to its close." 10 Wheat. [23 U. S.] 29. The term, "forms and modes of proceedings, embraces the whole progress of the suit, and every transaction in it, from its commencement to its termination." Id. 32. "This section (second section of the act of 1792) then goes on to prescribe the rules and principles by which the courts of equity and of admiralty jurisdiction were to be governed." Bank of U. S. v. Halstead, Id. 58, governed from the commencement of the suit; jurisdiction of course is included, and trial by jury preserved. The whole system would be deranged, by adopting the civil law as the rule of jurisdiction, and regulating and governing the forms and modes of proceedings by rules, principles and usages which were unknown to that code, and known only in that system in which courts of common law are recognised, as contradistinguished from those of equity and admiralty jurisdiction.

There is another view of our system of federal jurisprudence, which leads to the same conclusions. The judicial power of the United States is confined to the cases enumerated in the third article of the constitution; all others remain under the exclusive cognizance of the states, as a part of their powers, reserved by the tenth amendment; the eleventh section of the judiciary act also leaves to state courts a jurisdiction over the cases therein enumerated, concurrent with the circuit courts. Any exercise of jurisdiction by the district court in admiralty, over cases at law or in equity, must therefore clash with that of the courts of the several states, as well as of the circuit courts. This will be avoided by adhering to the line of separation between the respective courts, as designated by the statute and common law of England, at the revolution or adoption of the constitution, and the system will be harmonious and consistent in all its parts, both federal and state. On the other hand, by attempting to introduce the admiralty jurisdiction of the civil law, or those principles which were asserted in early times in its favour, a foundation is laid for interminable conflicts of jurisdiction between the courts of the state and the

union. Conceding, ex gratia, that the constitution admits of two constructions, that the seventh amendment does not remove the doubt, that the judiciary act does not exclude cases at law and equity, as defined by the common law, from the cognizance of courts of admiralty, and that the provisions of neither will be violated by the exercise of admiralty jurisdiction as claimed before the statutes which restrained it; it cannot be denied that they admit of a different and more obvious construction, more conducive to the harmonious movements of the two systems of state and federal jurisprudence; and which ought to be adopted, if it can be done consistently with the words,. or spirit of the constitution and laws. The decisions of the supreme court have conclusively established the principle that the terms cases in law and equity in the constitution, and suits at common law, in the seventh amendment, are therein used as they are defined by the common law; some powerful reasons ought therefore to be given why the term "cases of admiralty and maritime jurisdiction" have not been used according to their common law definition, but in reference to its definition in a system, in all respects in collision with the common law. No such reasons have been given in argument, or appear in any of the cases referred to.

If there was any middle ground between the audacious pretensions of the admiralty in virtue of prerogative, and the limits prescribed by the statutes and common law of England, on which to place the admiralty jurisdiction of the district courts, there would be more reason for entertaining a doubt as to the meaning of the constitution, its amendments, and the judiciary act. But there is no middle ground on which to place such jurisdiction; when we once break over the line which restrained it by acts of parliament and prohibitions, we are necessarily thrown back on the civil law and the royal prerogative, for the rules and principles on which the right of trial by jury depends. It is in vain to contend that the seventh amendment will be any efficient guarantee for this right, in suits at common law, if an admiralty jurisdiction exists in the United States, commensurate with what is claimed by the claimant in this case. Its assertion is, in my opinion, a renewal of the contest between legislative power and royal prerogative, the common and the civil law, striving for mastery; the one to secure, the other to take away the trial by jury; and until the authoritative judgment of a higher court shall make it my duty to surrender my judgment to their decree, it will never be sanctioned by me. Judicial power must first annul the seventh amendment, or judicial subtlety transform "a suit at common law, into a case of admiralty and maritime jurisdiction," before I take cognizance of such a case as this without a jury. Both parties

are citizens of Pennsylvania, the cause of action arose in the body of a county, the contract is governed by the common law, its subject matter is not of a maritime nature, or regulated by public or maritime law; but in all its aspects, a suit upon it from its commencement to its close, is cognizable only in a state court.

Viewing the question on which this case must turn, as involving most important consequences, I have given it a consideration not called for by the small amount in controversy, but called for on account of the principles it involves, as well as my duty to the profession and suitors, in cases which may come to this court by appeal. If it should be thought that any of the foregoing principles would shake the jurisdiction of the admiralty over contracts for seamen's wages, it must be admitted that the objection would have great, if not conclusive force, if the question was a new one; but in deciding on this, and other great questions of power, whether of courts or legislatures, the proper inquiry for a judge, is not merely into the original principle on which it depends, but also the practical, undisturbed, unquestioned exercise of jurisdiction for a long course of time. It is not only a powerful reason in favour of its legitimate existence, but to question it after it became recognised by all departments of the government, might tend more to shake foundations, than an adherence to a principle at first erroneous.

In England, the statutes of Richard II., or Hen. IV., have never been applied to suits for seamen's wages. Courts of common law have not issued prohibitions to the admiralty, against the exercise of this part of their jurisdiction; the judges have considered it as not embraced in the statutes, but as an exception to them, or sanctioned by the maxim of communis error facit jus. The reason is immaterial, the matter is at rest by common consent, the jurisdiction of the admiralty is unquestioned there, as a practical undisturbed construction of ancient statutes. So it is here. It has been exercised in the states before the confederation, from its adoption till the adoption of the constitution, and since then by the federal courts. In Sheppard v. Taylor, [5 Pet. (30 U. S.) 710,] the supreme court unanimously declared, "that over the subject of seamen's wages, the admiralty has an undoubted jurisdiction in rem, as well as in personam." Thus definitively settled, this matter is certainly not open to argument here. Though a contract for seamen's wages is made on land, and is cognizable by courts of common law, yet they must adjudicate upon it by the rules and principles of the maritime law. The rights it creates, the duties and obligations it imposes, the penalties it inflicts, the conditions and casualties to which it is subject, are mostly unknown to the principles of the common law, and a suit upon it partakes of few of the attributes of a "suit at

common law." They are prescribed and regulated by the public or maritime law, so that though the suit to enforce the payment of wages, or the performance of the service, may be at common law, yet the controversy concerning them is not necessarily a case in law. The rights to be ascertained are not legal, as contradistinguished from cases in equity and admiralty in the third article, and the remedy by libel in the admiralty is not the suit at common law, but that peculiar proceeding, by the mixture of public, maritime and equity law, in the same suit, which, according to not only the opinion of the supreme court, but the correct legal construction of the seventh amendment to the constitution, is not forbidden by its provisions. So it was considered by the first congress which assembled after the adoption of the constitution, in the session succeeding that in which the same body recommended the amendments to the constitution. In the sixth section of the act of 1790, [1 Stat. 133,] for the regulation of seamen in the merchant service, they have a right to proceed in the district court for their wages, "and the suit shall be proceeded on in the said court, and final judgment be given, according to the course of admiralty courts in such cases used;" provided that nothing shall prevent any seaman or mariner from having or maintaining his action at common law, &c. 1 Story, 105, [1 Stat. 133, § 6.] In the previous sections of this law, there are various other provisions relative to seamen, which make the contract of service a statutory contract, peculiarly appropriate to admiralty and maritime jurisdiction, as regulations of commerce and navigation, and the service is in its nature maritime. But the law has made no provision for the exercise of admiralty jurisdiction over contracts for materials, labour or provisions, in building, equipping, furnishing or provisioning a ship when in our ports. Such contracts have no maritime attributes, but as to the rights and obligations imposed and arising, are regulated exclusively by the statute and common law of the states; and all controversies concerning them must be cases in law, in which legal rights are to be ascertained according to the old and settled proceedings of such courts, according to the law which regulates right and remedy, in as marked contradistinction to those in courts of admiralty, as the latter are to the former. Such cases therefore come directly within the seventh amendment, and agreeably to its solemn and authoritative exposition, are not cognizable in the admiralty.

The next aspect in which this account is presented for consideration, is as an off-set to the demand of the libellant, for which the respondent produces no authority from any writer of authority on maritime law, or any adjudication in the admiralty, but rests on general principles of law and equity. The contract for wages is a marine one, and from its nature, and the principles which govern it, seems to me not to come within the provisions of any statutes of set-off, their equity, or any analogous principle adopted by courts of law or equity. There are cases where each party having a judgment or decree for money, in the suits in which they are respectively plaintiffs, and entitled to the process of the court for collection; and the parties and the causes of action being within its jurisdiction, the court can do justice between them, by deducting the amount of the one judgment from the other, and order process only for the balance, or where a claim, over the subject matter of which the court have jurisdiction is pending before the same court in which a defendant has obtained a judgment; a court of law as well as equity may, in certain cases, direct proceedings to be stayed, till the other party can have an opportunity of a trial or hearing. And as courts of admiralty undoubtedly possess equity powers, the same rule may prevail there; but it is not necessary to the decision of this case to enter on the inquiry, or to attempt to specify the cases in which it could be done. As the admiralty has not jurisdiction of this account, as an original claim, they cannot take cognizance of it in shape of a set-off, as they have no power over the subject matter of the respondent's claim.

To subject the wages of a mariner to a defalcation on account of debts due to the owner of the ship, on matters unconnected with the particular contract, would be to deprive the former of all inducement to enter the service, which is to get bread for himself and family and secure a subsistence for them in his absence. It would be not only hard, but oppressive on him, at his return from a long voyage, to find his wages attached by a debt due the owner, or purchased by him from another, and neither stipulated or contemplated at the time of the contract to be charged upon his wages, and without any previous notice that an attempt would be made to do so. That the owner has no such right by the marine law is very evident from the following rule. "If a mariner takes up money or clothes, and the same is entered on the purser's books; by the marine custom it is a discount or receipt of so much of their wages as the same amounts to, and in an action brought by them for their wages the same shall be allowed, and is not accounted mutual, the one to bring his action for his clothes, and the other for his wages." Molloy, bk. 2, c. 3, rule 11, p. 249.

This is certainly a direct negation of the general right of set-off, or no provision would have been deemed necessary for such case; suggestio unius est exclusio alterius, is an old and safe maxim of the law. This subject has been taken up by the learned judge of the first circuit, and very ably considered; concurring fully with him in his views, and the conclusions, to which he arrived as to set-off in the admiralty, it is unnecessary to do more

than to refer to his opinion, as reported in Willard v. Dart, [Case No. 17,680.] As it is not averred in the answer, that any of the supplies of provisions were made on the faith of, or with reference to the contract for wages, it cannot be pretended that they can be considered as payment. There are also other strong, if not conclusive objections, to this account, all the items preceding that of January 1831, are barred by the act of limitations, which might have been conclusive if it had been pleaded, and whether pleaded or not, the libellant could, at the hearing, have availed himself of the staleness of the claim and the lapse of time, on equitable principles, as settled in this court in Baker v. Biddle, [Case No. 764,] in suits in equity, and in the circuit court in the first circuit in the case of Willard v. Dart, [supra.] &c. This case affords a very powerful reason for the application of the rule. The answer does not state whether the provisions were furnished to the libellant for the supply of vessels on his own account, or of the owners thereof. If he was merely the master, the accounts ought to be furnished seasonably before he settles with the owner, and if not done before such settlement or in a seasonable time, according to marine usage, are proper charges only against the owner.

The decree [unreported] of the district court is affirmed with six per cent. interest and costs.